## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| STAFF IT INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-H-04-2210 |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION

Staff IT, Inc., a Texas corporation, failed to pay all of its employment taxes in 2001 and 2002. The IRS refused to abate the penalties assessed under 26 U.S.C. §§ 6651(a)(2) and 6656 for this failure. Staff IT filed this suit to challenge the IRS's denial of the penalty abatement request. The IRS has moved for summary judgment, asserting that as a matter of law, based on the undisputed evidence in the record, Staff IT cannot make the showings necessary for penalty abatement. In its response, Staff IT challenges the IRS's standard for determining whether penalties can be abated when financial hardship is the reason for the failure to make a timely payment of the employment taxes. Staff IT argues that it has raised fact issues precluding summary judgment. Based on the record, the motions and responses, and the applicable law, this court grants the IRS's motion for summary judgment, for the reasons explained below.

I.      **Background**

The summary judgment record includes an affidavit from Staff IT's president, chief accounting and financial officer, and 40 percent shareholder, Rick McMinn, as well as portions of his deposition testimony.  McMinn provided a detailed description of the history of Staff IT and the reasons it failed to pay employment taxes in the quarters at issue.  The relevant financial and accounting records are also part of the record.

Staff IT is an accrual basis taxpayer based in Houston, Texas.  It was incorporated in 1996 as a staffing company to procure computer programmers and other technical personnel for outside businesses.  The businesses would typically hire Staff IT to locate temporary or contract personnel to fill computer programming or other technical positions.  Once located, the individual workers, known as "contractors," would be put on Staff IT's payroll, but work under the client's direction.  Each pay period, Staff IT would pay the individual contractors, withholding payroll taxes.  Staff IT would invoice the client for the services the contractors provided, including a surcharge of approximately 30 percent.  A client would usually pay 30 to 60 days after the invoice is sent.  The gap between Staff IT's payment to contractors and the receipt of payment from clients delayed Staff IT's access to cash flow from these invoices.  Staff IT addressed the delay by borrowing from a financing company willing to extend credit despite the fact that Staff IT had no assets to serve as collateral other than its accounts receivable.  Such a financing company is known as a "factoring company" and charges a relatively high rate of interest.  Staff IT paid its factoring company, Prinvest, an interest rate of approximately 30 percent per annum.  Prinvest would forward Staff IT

approximately 70 to 80 percent of the invoice amount expected from the client and Staff IT would ask the client to pay Prinvest directly.  Staff IT used this money to pay employee salaries and other expenses, including employment taxes.  Once Prinvest received payment from Staff IT's client, Prinvest would deduct its fees and forward the remaining amount to Staff IT.  (Docket Entry No. 16, Ex. 9 at 14).

By mid-2001, Staff IT had grown to nearly $16 million in annual billings, with over 200 contractors, nearly $1.6 million in accrued monthly revenues, and cash flow of over $2 million per month.  Staff IT's payroll tax deposits were nearly $3 million in 2000 and nearly $2 million from January through September 2001.  Staff IT timely paid its employment taxes until the last quarter of 2001.

Beginning in May 2001, Staff IT faced a series of financial difficulties.  From May through August 2001, Compaq Computer, Staff IT's single largest client, laid off a large part of its workforce, including 55 Staff IT contractors.  Staff IT lost $400,000 in revenues as a result.  During this same period, Enron and Dynegy laid off 12 contractors hired from Staff IT.  In August 2001, Prinvest, Staff IT's financing company, declared bankruptcy, leaving Staff IT with no financing source.

The effects of the September 11, 2001 terrorist attack on financial markets and business activities caused further reduction in clients' demand for contractors and further difficulties in Staff IT's ability to obtain financing.  Staff IT owed money to its former factoring company, Prinvest, which had a secured interest in Staff IT's receivables.  In October 2001, Prinvest threatened to exercise its contractual right to call in Staff IT's

receivables if it did not receive a $300,000 payment.  McMinn, who with the other two Staff

IT shareholders had personally guaranteed Prinvest's loan to Staff IT, borrowed $300,000

against his house and loaned the money to Staff IT to pay Prinvest, giving Staff IT time to

locate another factoring company.  Staff IT repaid McMinn for the loan on the same terms

he received from the bank.  At the same time, Staff IT continued to pay McMinn's $240,000

annual salary.

Staff IT cut some expenses during this period.  Some of these expenses, however,

were not eliminated but merely deferred until the following month.  In October 2001, Staff

IT continued to have contractors work at Enron and Compaq, despite announcements by

those companies that they would delay invoice payments.  Staff IT asserts that it cut other

"G & A" costs — a catch-all category of expenses — including some advertising and

recruiting expenses, but no directive to cut expenses issued.  (Docket Entry No. 16, Ex. 9,

at 47).  Staff IT paid $100,000 to creditors besides Prinvest in October 2001.  During this

period, Staff IT increased marketing efforts by shifting two staff people from recruiting

contractors to selling services.  The marketing efforts were part of a plan to overcome the

financial difficulties through an "increase in the business in order to be able to catch up."

(*Id.* at 71).  This growth strategy was the basis for Staff IT's business decisions.  (*Id.* at

79–80, 93–94).

In November and December 2001, another Staff IT client, Enron, weakened and

eventually went into bankruptcy.  Staff IT claims that it lost approximately $450,000 in

receivables as a result, a loss it did not pursue in the bankruptcy courts because of the

expenses and fees required to do so.

Staff IT failed to make payroll tax deposits in November and December 2001.  During this period, Staff IT asserts that it "delayed" payments to certain third-party contractors and on certain debts, but admits that it did not reduce the number of contractors on its payroll, reduce the number of employees, reduce salaries — including those paid to the owners/shareholders — or issue a broad directive to reduce expenses.  At that time, Staff IT was expecting increased business as a result of the increased marketing efforts.  Staff IT decided not to pay its payroll tax deposits, which would have resulted in Staff IT running out of cash in November 2001.  Instead, Staff IT hoped that new business in 2002 would enable it to pay the past-due fourth-quarter 2001 payroll taxes, as well as make timely deposits of 2002 payroll taxes.

During this period, Staff IT continued to spend money on marketing and advertising efforts and to pay its operating expenses.  Staff IT continued to provide monthly vehicle allowances for its employees who had to drive to client sites.  Staff IT spent money to take clients to professional baseball games; its expenses included $830 in parking for such games. Staff IT spent $3,500 on a Christmas party and spent money on promotional items such as drink "koozies," which it justified as part of its advertising and client relations efforts.  Staff IT spent $800 on Christmas hams for its contractors.  Staff IT also continued to take clients to meals at Staff IT's expense.

In early 2002, Staff IT's anticipated business increase not only failed to materialize, its existing business declined.  Staff IT had still not obtained a replacement financing source.

Another Staff IT client, Global Crossing, filed for bankruptcy protection.  Staff IT attempted to cut some costs, but negative cash flow outpaced the cost cuts.  In February 2002, Staff IT cut some debt payments, reduced rent payments, and reduced payments to third-party contractors.  Staff IT continued to pay its contractors and to pay operating expenses.  Staff IT made no layoffs and did not reduce salaries or contractor wages.  In the absence of a financing source, McMinn loaned another $50,000 to Staff IT.  Staff IT did not make any payroll tax deposits in the first two months of 2002.  Staff IT believed the downturn to be temporary and hoped that once it secured a new source of financing, it could pay the IRS.

In March and April 2002, Staff IT secured a new financing source.  Recognizing the need to reduce expenses, Staff IT did lay off some employees and contractors.  Staff IT continued business with its smaller workforce, but cut salaries and costs.  Staff IT reduced the salaries of the three officer/shareholders by 57 percent from 2001 levels — reducing pay for each of them from $240,000 to $104,000 in 2002 and 2003.  Staff IT cut other employees' salaries by 22 percent over 2001 levels.  Staff IT cut the monthly vehicle allowance and the client meals it paid for.  Staff IT cut advertising expenses by 18 percent in 2002, and cut them again in 2003, making advertising costs 37 percent less in 2003 than they were in 2001.  Before it could obtain financing, Staff IT had to pledge its receivables to the new financing company.  To accomplish this, Staff IT first had to pay back the money it owed Prinvest, which had a lien on the receivables.  Staff IT paid Prinvest $200,000.  Staff IT continued to pay operating costs, but did not resume paying its payroll taxes.

In March and April, Staff IT's monthly accrued revenues, and the number of its contractors working at clients, reached the lowest level.  Staff IT did not make any payroll tax deposits until June 2002, when it deposited approximately $93,000 in its IRS account. Staff IT was not generating enough income to pay the IRS for current taxes, much less the back taxes owed.

During the last six months of 2002, Staff IT was paying most of its payroll taxes as they accrued, with the exception of December 2002.  In that month, the financing company retained sums and caused Staff IT to fall short on its deposit of payroll taxes.  Staff IT did not, however, pay the IRS the back payroll taxes.  It met its wages, interest, and operating cost obligations, but owed its attorneys and others over $200,000 at the end of the year.

The IRS issued a Final Notice of Intent to Levy to Staff IT on October 14, 2003 and a Notice of Federal Tax Lien Filing on November 7, 2003.  Staff IT responded by requesting a due process hearing before an IRS Appeals settlement official.  In February 17, 2004, the IRS Appeals settlement officer met with Staff IT.  Staff IT requested a penalty abatement, as well as an installment plan and account transcript.  On April 28, 2004, after a hearing and review of Staff IT's request, the IRS Appeals settlement officer determined that Staff IT failed the standard necessary for penalty abatement, rejected Staff IT's request, and gave Staff IT until May 10, 2004 to satisfy its current compliance requirements.  Staff IT asked for an installment plan, which the settlement officer rejected because Staff IT failed to remain

in current compliance.  IRS Appeals issued a formal denial of the requests for penalty abatement and installment plan on May 13, 2004.  Staff IT appealed this determination by filing this suit.

## III.    The Government's Motion for Summary Judgment

In its response to the IRS's motion for summary judgment, Staff IT waived its claims for relief from the denial of the request for an installment agreement and an account transcript.  (Docket Entry No. 23 at 2).  The IRS's motion for summary judgment on those issues is granted.[1]  The remaining issue is whether the government is entitled to summary judgment that Staff IT did not make the showing necessary for an abatement of penalties for failing to pay employment taxes for the quarters ending December 31, 2001, March 31, 2002, and September 30, 2002.

### A.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56.  Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

---

[1] Staff IT has moved to exclude evidence the IRS submitted showing that while this lawsuit has been pending, Staff IT has failed to pay employment taxes.  As of July 2004, Staff IT had accrued delinquent tax liabilities of nearly $1.5 million. Staff IT asserts that this suit relates only to penalty abatement for the failure to pay in the three tax quarters ending December 31, 2001, March 31, 2002, and September 30, 2002. (Docket Entry No. 22).  The IRS submitted this evidence in its motion for summary judgment in relation to the installment agreement issue that Staff IT later waived.  The motion to exclude is denied as moot.

(1986); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  If the burden

of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary

documents that negate the existence of some material element of the opponent's claim or

defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden

of proof at trial, demonstrate the evidence in the record insufficiently supports an essential

element or claim.  *Celotex*, 477 U.S. at 330.  The party moving for summary judgment must

demonstrate the absence of a genuine issue of material fact, but need not negate the elements

of the nonmovant's case.  *Bourdeaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir.

2005).  "An issue is material if its resolution could affect the outcome of the action."  *Weeks

Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir.2003) (citing *Anderson

v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  If the moving party fails to meet its initial

burden, the motion for summary judgment must be denied, regardless of the nonmovant's

response.  *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373,

375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot

survive a motion for summary judgment by resting on the mere allegations of its pleadings.

The nonmovant must identify specific evidence in the record and articulate the manner in

which that evidence supports that party's claim.  *Johnson v. Deep E. Tex. Reg'l Narcotics

Trafficking Task Force,* 379 F.3d 293, 305 (5th Cir. 2004).  The nonmovant must do more

than show that there is some metaphysical doubt as to the material facts.  *Armstrong v. Am.

Home Shield Corp.,* 333 F.3d 566, 568 (5th Cir. 2003).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

In this case, the taxpayer bears the burden of proof on whether it is entitled to have the penalties for nonpayment abated. The IRS has the burdens of a summary judgment movant. The facts and inferences must be reviewed in the light most favorable to Staff IT to determine whether there is a genuine issue of material fact. If there is no genuine issue of material fact, the question is whether the IRS is entitled to judgment as a matter of law. *E. Wind Indus., Inc. v. United States*, 196 F.3d 499, 504 (3d Cir. 1999).

### B.     The Standard for Penalty Abatement

Sections 3102(a) and 3402(a) of the Internal Revenue Code require an employer to deduct and withhold income and social security taxes from its employees' wages. Section 7501 of the Internal Revenue Code provides that these taxes must be held by the employer as a special trust fund for the benefit of the United States. Section 3403 provides that the employer is liable for the payment of the taxes required to be withheld under Sections 3102 and 3402. The employer is required to report the amount of withheld taxes on its payroll tax return, Form 941. This return and a payment of employment taxes is due every calendar

quarter.  I.R.C. § 6011(a).  An employer is required to deposit the employment and income taxes withheld in an approved bank at various intervals during a calendar quarter, depending on how much is withheld.  I.R.C. § 6302 and 26 C.F.R. § 301.6302-1.

The IRS imposes mandatory penalties for failing to file returns, pay taxes, or deposit employment taxes in a government depository, unless the taxpayer can show that such failure was due to "reasonable cause" and not due to "willful neglect."  26 U.S.C. §§ 6651(a)(1), (a)(2), 6656(a).  Interpreting Section 6651(a)(1), the Supreme Court held that the taxpayer bears the "heavy burden of proving both (1) that the failure did not result from 'willful neglect,' and (2) that the failure was 'due to reasonable cause.'"  *United States v. Boyle*, 469 U.S. 241, 245 (1985).  In *Boyle*, the Court interpreted "willful neglect" to mean "a conscious, intentional failure or reckless indifference."[2]

"Reasonable cause" is not defined in the Internal Revenue Code.  The Treasury Regulations interpreting the "reasonable cause" provision of Section 6651 reads, in pertinent part:

> If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause. A failure to pay will be considered to be due to reasonable cause to the extent that the taxpayer has made a satisfactory showing that he exercised ordinary business care and prudence in

---

[2]  The Court's analysis in *Boyle* addressed penalties for failure to file tax returns under Section 6651(a)(1). The language concerning the standard for failure to file a return is identical to the language in Sections 6651(a)(2) and 6656 for failure to pay and to deposit. The courts have applied *Boyle* to taxpayer challenges to penalties for failure to pay or deposit taxes under Sections 6651(a)(2) and 6656.  *See, e.g., E. Wind Indus., Inc.*, 196 F.3d at 504 n. 5; *Fran Corp. v. United States*, 164 F.3d 814, 816 n.2 (2d Cir. 1999).

> providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship (as described in § 1.6161-1(b) of this chapter) if he paid on the due date.

26 C.F.R. § 301.6651-1(c)(1).  An "undue hardship" is defined as:

> more than an inconvenience to the taxpayer.  It must appear that substantial financial loss, for example, loss due to the sale of property at a sacrifice price, will result to the taxpayer for making payment on the due date of the amount with respect to which the extension is desired.  If a market exists, the sale of property at the current market price is not ordinarily considered as resulting in an undue hardship.

26 C.F.R. § 1.6161-1(b).  To assess the evidentiary basis for a finding of "reasonable cause,"

> consideration will be given to all the facts and circumstances of the taxpayer's financial situation, including the amount and nature of the taxpayer's expenditures in light of the income (or other amounts) he could, at the time of such expenditures, reasonably expect to receive prior to the date prescribed for the payment of the tax.

26 C.F.R. § 301.6651-1(c)(1).

In this analysis, "lavish or extravagant expenses" or investments in "speculative or illiquid assets" that render a taxpayer's remaining assets insufficient to satisfy its tax obligations demonstrate a failure to exercise ordinary business care and prudence.  *Id.*  Section 301.6651-1(c)(2) of the Regulations provides:

> In determining if the taxpayer exercised ordinary business care and prudence in providing for the payment of his tax liability, consideration will be given to the nature of the tax which the taxpayer has failed to pay.  Thus, for example, facts and circumstances which, because of the taxpayer's efforts to conserve assets in marketable form, may constitute reasonable cause for nonpayment of income taxes may not constitute

> reasonable cause for failure to pay over taxes described in section 7501 that are collected or withheld from any other person.

26 C.F.R. § 301.6651-1(c)(2). [3]

The taxes at issue in this case are described in Section 7501. As noted, the employee portion of those taxes, collected or withheld by the employer as salaries are paid, are held in a "special fund in trust for the United States." 26 U.S.C. § 7501(a). The parties dispute the standard to be applied when financial difficulties are presented as "reasonable cause" to avoid the penalties for failing to pay "trust fund" employment taxes. The government urges this court to adopt the standard set by the Sixth Circuit in *Brewery, Inc. v. United States*, 33 F.3d 589 (6th Cir. 1994), which held that "financial difficulties can never constitute reasonable cause to excuse the penalties for nonpayment of withholding taxes by an employer." *Id.* at 592 (citation omitted). The *Brewery* court based this bright-line rule on both the trust language of Section 7501 of the statute and Section 301.6651-1(c)(2) of the Regulations, which provides through an example that failure to pay an employer's own income taxes may be easier to justify under the "reasonable cause" standard than a similar failure to pay trust fund taxes. The court interpreted this regulation to mean that a heightened standard applied for reasonable cause for a failure to deposit or pay employment taxes, which are funds held in trust for the United States under 26 U.S.C. § 7501. *Id.* Given this

---

[3] In addition, the IRS has identified certain specific reasons for the late filing of a return which, if established by the taxpayer, will be accepted as "reasonable cause." *See Roberts v. Comm'r of Internal Revenue*, 860 F.2d 1235, 1241 (5th Cir. 1988) (citing Internal Revenue Manual (CCH) § 4562.2). None of these specific circumstances is present here.

heightened standard, the Sixth Circuit held that "the use of trust funds for the payment of other creditors cannot, as a matter of law, constitute reasonable cause to excuse the penalties for nonpayment of withholding taxes by an employer." *Id.*

The Second, Third, and Ninth Circuits have rejected this bright-line test.  These courts have found that such a rule is inconsistent with the "reasonable cause" standard and the Treasury Regulations that require courts to assess "all the facts and circumstances" to determine whether the taxpayer exercised ordinary business care and prudence in providing for its payroll tax obligation.  *See, e.g.*, *Van Camp & Bennion v. United States*, 251 F.3d 862 (9th Cir. 2001); *E. Wind Indus.*, 196 F.3d at 507–09; *Fran Corp.*, 164 F.3d at 820.  The majority rule rejects this bright-line test in favor of a multifactor approach to the "reasonable cause" analysis.  Those courts have held that the "reasonable cause" analysis must flow from "a factual assessment of the taxpayer's financial situation to determine whether it has exercised ordinary business care and prudence in responding to competing financial obligations."  *Fran Corp.*, 164 F.3d at 819.

This disagreement among the circuits affects the analysis more than the outcome of most cases.  The same courts rejecting *Brewery*'s bright-line approach agree that the circumstances must be compelling for financial concerns to constitute reasonable cause to abate penalties for nonpayment of employment taxes.  *Van Camp & Bennion*, 251 F.3d at 868; *E. Wind Indus., Inc.*, 196 F.3d at 508; *Fran Corp.*, 164 F.3d at 819.  "We recognize that it will be the rare case where the government is made the 'unwilling partner in a floundering business,' without the employer incurring the duty to pay a penalty for having made such a

choice, but it nonetheless remains for the court in each case to weigh all of the factors identified in the Regulations." *Fran Corp.*, 164 F.3d at 819 (quoting *Brewery*, 33 F.3d at 593 (additional quotations and citations omitted)).

Only one reported appellate case has found that a taxpayer's failure to pay and deposit employment taxes timely was due to reasonable cause and not willful neglect.  In that case, the taxpayer's financial viability and cash flow was dependent on government contracts. Corrupt government employees demanded bribes from the taxpayer as a condition of receiving the contracts.  The court held that the government was "not an unwilling partner in a floundering business, but an active participant." *E. Wind Indus.*, 196 F.3d at 508.  The court went on to emphasize that the taxpayer only paid those creditors and a small number of employees whose services were essential to operating its business at a minimal level in order to collect monies contractually due so they could pay the IRS; the owners incurred substantial debts, including a mortgage on their home and other personal loans, to provide additional cash for the taxpayer to remain in business to collect the money necessary to pay the IRS; and the taxpayer did not pay operating expenses, including rent.  *Id.* at 509.  Based on these factors, the court concluded that choosing to pay these creditors over the trust fund taxes did not amount to willful neglect.

The Fifth Circuit has not weighed in on the dispute among the circuits.  This case does not require this court to choose sides.[4]  Under either the bright-line test or the multifactor test,

---

[4]  This court, however, respectfully notes its disagreement with the Third Circuit's public policy basis for interpreting Section 301.6651(c)(1) of the Treasury Regulations.  *Compare E. Wind Indus., Inc.*, 196 F.3d at 509 *with id.* at 513 (Stapleton, J., dissenting) ("Contrary to the Court's suggestion, § 301.6651-1(c)(1) does

the IRS is entitled to summary judgment.

## III.    Analysis

Staff IT claims that the disruption of its business with Compaq, the collapse of Enron, WorldCom, and Global Crossings, the loss of its financing arrangement with Prinvest, and the problems in the financial sector after 9/11 combined to frustrate its ability to pay its payroll taxes.  Staff IT has presented undisputed evidence of financial troubles.  The case law uniformly holds that such evidence is by itself inadequate to raise a fact issue that a failure to make timely payroll tax deposits was due to reasonable cause rather than willful neglect.

Staff IT justifies its choice to pay creditors over its employment taxes because of its financial difficulties.  The evidence as to Staff IT's income and expenses is undisputed. Under the *Brewer* approach, the IRS is entitled to judgment as a matter of law because financial hardship cannot show a reasonable cause for failing to pay employment taxes when due.  Under the multifactor analysis, this court must consider whether Staff IT has raised a fact issue as to whether it exercised ordinary business care and prudence in providing for the payment of its tax liability.  This in turn requires examination of the amount and nature of Staff IT's expenditures in light of the amounts it could reasonably expect to receive before the taxes were due.  Courts applying the multifactor test look to the taxpayer's expenditures

---

not create a general 'ordinary business care and prudence' standard for judging how a taxpayer has conducted its business.  It speaks solely to situations in which the taxpayer has (or has not) 'exercised ordinary business care and prudence *in providing for payment of his tax liability*,' only to have his efforts thereafter frustrated by events beyond his control." (emphasis added in original)).

before and after the taxpayer failed to pay its withholding taxes and the taxpayer's treatment of other creditors vis-à-vis the IRS.

Staff IT faced severe financial difficulties beginning in May 2001.  From May to August, Staff IT had a 50 percent drop in its business and its finance company filed for bankruptcy.  Staff IT knew that its dependence on the "factor" made it financially vulnerable and would significantly affect its cash flow.  The events of 9/11 had immediate and obvious effects on the economy, which Staff IT felt.   In October 2001, Staff IT did not pay employment taxes.  Nor did it reduce contractors, lay off employees, reduce salaries paid to its officer/shareholders, or take significant steps to cut costs.  Instead, Staff IT increased marketing efforts.

In November and December 2001, Staff IT did not make payroll tax deposits.  Staff IT asserts that it would have run out of cash in November had it paid "all" of the taxes, but still did not take aggressive steps to reduce its costs.  As McMinn testified, Staff IT wanted to grow and expand, to fill in the "big hole" created by the loss of Compaq and Enron business.  (Docket Entry No. 16, Ex. 9 at 95).  Pursuing this strategy of expansion, Staff IT did not lay off employees, reduce the number of contractors, or reduce the salaries it paid. Staff IT continued to pay monthly vehicle allowances, threw a holiday party at a cost of $3,500, distributed $800 worth of holiday hams, continued to take clients to lunch, and continued to distribute promotional merchandise to clients.  Although McMinn argued that

client relations and contractor loyalty were important in this competitive field, he also admitted in his deposition that most of these expenses were not essential to the company's survival.

In the first quarter of 2002, Staff IT's business continued to decline.  No payroll tax deposits were made.  Yet Staff IT did not lay off any employees until March and April.  Staff IT did not cut officers' compensation or salaries until April 2002.  Staff IT did not reduce advertising expenses until March and April 2002.  Staff IT did not cut the vehicle allowance or client lunches until April 2002.  Throughout this period, Staff IT continued to pay general operating expenses, such as rent, air conditioning, and heating.  In the third quarter of 2002, Staff IT deposited a portion of what it owed and continued to operate its business, hoping to sell the company when the market improved.

This court concludes that Staff IT has not raised a triable issue as to whether its failure to make timely payroll deposits was due to reasonable cause and not willful neglect.  Staff IT's strongest evidence of "reasonable cause" is the fact that McMinn himself made contributions from his personal finances, contributing over $350,000 to keep Staff IT afloat. But Staff IT used the funds McMinn contributed to pay other creditors, not the IRS, in the hope that the company would grow past its financial problems, and, later, hang on until it could find a rescuing buyer.  McMinn conceded that Staff IT had paid nearly all of its operating expenses — including timely debt payments to McMinn — but nevertheless failed to pass the employment taxes it had collected to the IRS.  (Docket Entry No. 16, Ex. 9 at 88).

A finding that the taxpayer prefers other nonessential creditors over the IRS weighs against a finding of "reasonable cause."  *See Fran Corp.*, 164 F.3d at 819 (finding that continued rental payments to the company president who had an outstanding loan of nearly $150,000 from the company, the company's decision to fund new auto leases and pay for repairs to existing company cars, and spending over $15,000 in entertainment expenses instead of repaying the IRS failed to demonstrate "reasonable cause"); *In re Frederick Savage, Inc.*, 179 B.R. 342 (Bankr. S.D. Fla. 1995) ("[M]ere financial difficulties or cash flow problems are insufficient to establish 'reasonable cause' by virtue of financial disability. This is particularly clear where, as here, the corporate taxpayer continued its business operations as a going concern during the six quarters at issue, but chose to pay creditors other than the United States.") (citing *Wolfe v. United States*, 612 F. Supp. 605, 608 (D. Mont. 1985), *aff'd*, 798 F.2d 1241 (9th Cir. 1986)).  Favoring other creditors over the IRS can also indicate willful neglect.  *See, e.g.*, *Brewery, Inc.*, 33 F.3d at 591, 593; *C.J. Rogers v. United States*, No. 89-70209, 1990 WL 25586, at *2 (E.D. Mich. Sept. 17, 1990).  In the fourth quarter of 2001 and first quarter of 2002, despite the heavy loss of business because several of its major clients had encountered financial problems, despite the significant cash flow problems resulting from the bankruptcy of its financing company, Staff IT chose to continue paying virtually all its creditors, its employees' and officers' salaries and wages, and its operating expenses over the payroll tax obligation.

A taxpayer's willingness to cut costs and personnel is also highly relevant.  *See In re McTyre Trucking Co., Inc.*, 223 B.R. 588, 594 (Bankr. M.D. Fla. 1998) (determining that the

debtor had not established reasonable cause in exercising ordinary business care and prudence when the company president, with full knowledge of the nonpayment, continued to pay himself and his wife more than $1 million in salary over six years, continued to reside at a 200-acre ranch without using the property as collateral, waited six years to lay off workers, and compensated company insiders for over seven years after the company's alleged "financial hardships" began).  Staff IT blames the loss of business beginning in May 2001, the bankruptcy of its finance company in August 2001, and the effects of 9/11, for its failure to make payroll tax deposits beginning in October 2001.   Yet Staff IT delayed significant personnel reductions, salary reductions, or expense reductions until March and April 2002.   Until April 2002, Staff IT continued to pay its officers the same salaries ($240,000 each).  Staff IT retained its employees and contractors.  Staff IT continued to pay such nonessential expenses as Christmas parties, client entertainment, and client lunches. Unlike the taxpayer in *East Wind*, Staff IT did not pay only essential creditors and a small number of employees to keep the business operating at a minimal level to collect monies that were due to pay the IRS.   Instead, Staff IT  attempted to "grow" the company and paid expenses toward that goal rather than its payroll tax obligation.  When Staff IT finally did make personnel and expense cuts, it was too late to enable it to provide for the payment of its tax liabilities in the final quarter at issue.  The undisputed evidence shows that Staff IT did not exercise ordinary car and prudence in arranging to pay its tax liability in any of the quarters at issue.

## IV.    Conclusion

The record fails to raise a fact issue as to whether Staff IT had a reasonable cause for failing to pay its trust fund taxes when due and as to whether the failure was not due to willful neglect.  The government's motion for summary judgment is granted.  Final judgment is entered by separate order.

SIGNED on February 9, 2006, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge